694 So.2d 1032 (1997)
STATE of Louisiana and Debra A. Rojas
v.
Emile C. FRISARD, III.
No. 96-CA-368.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 1997.
*1033 Michel Morel, Assistant District Attorney, Parish of Jefferson, Gretna, for Plaintiffs-Appellees.
Emile C. Frisard, III, Metairie, pro se.
Before GAUDIN, DUFRESNE and CANNELLA, JJ.
DUFRESNE, Judge.
Defendant, Emile C. Frisard, III, appeals a Judgment declaring him to be the father of the minor child, A.D.W., as well as a subsequent Judgment ordering him to pay support to the minor child. We affirm the paternity Judgment, but reverse the child support Judgment and remand the matter for recalculation due to lack of adequate documentation in the record before us.

BACKGROUND
This case was instituted pursuant to the provisions of the Uniform Reciprocal Enforcement of Support Act (URESA), as set forth in LSA-Ch.C. arts. 1301, et seq.[1] In the fall of 1992, the state of Florida filed a URESA petition on behalf of plaintiff, Debra A. Rojas, with the Jefferson Parish Juvenile Court, seeking the establishment of paternity, child support and medical coverage for her minor child, A.D.W. In the supporting paternity affidavit, plaintiff alleged that defendant was the father of the child, that the child was conceived in September of 1983,[2] that she did not have sexual intercourse with any other man within the thirty days prior to or subsequent to the date of conception, that she was not married at the time of the child's birth, and that the child resembled the defendant insofar as she had the same birthmark and facial features.
Defendant was eventually served with the petition and appeared in court for a paternity hearing in January of 1994, at which time he denied paternity. Following numerous pre-trial motions and discovery matters, the case, on December 11, 1995, proceeded to trial for a determination of the paternity issue. Having considered the law and evidence presented, the juvenile court judge on January 17, 1996, issued a written Judgment finding defendant to be the father of the minor child, A.D.W. Defendant thereafter filed a Motion for Reconsideration and Admission of Evidence which was denied by the trial judge.
In accordance with the finding of paternity, the court, on February 26, 1996, conducted a hearing to determine the amount of support. As a result of the support hearing, the court ordered defendant to pay $436.81 per month in child support retroactive to the date of the filing of the petition, resulting in arrears in the amount of $17,909.21. The judge thereafter ordered defendant to pay $100.00 per month toward his arrears and $25.00 per month toward the cost of blood work which amounted to $314.00. In addition, *1034 defendant was assessed 5% court costs. As a result of this Judgment, defendant filed a Motion for Rehearing and Admission of Evidence which was denied by the trial judge.
Defendant, who has represented himself pro se throughout most of these proceedings, now appeals, asserting four assignments of error.

DETERMINATION OF PATERNITY
Defendant initially complains about the trial court's determination that he is the father of A.D.W. He specifically alleges that the trial court, in making its finding of paternity, failed to consider the "true conception date," and also relied on inaccurate testimonies and substantive facts in her reasons for judgment. Defendant additionally objects to the trial judge's conclusions as to witness credibility and to her characterization of his testimony as incredible without giving any reasons for that finding.
The fact of paternity obliges a father to support his child. Dubroc v. Dubroc, 388 So.2d 377 (La.1980); LSA-C.C. art. 240. However, the fact of paternity must be proved by a preponderance of the evidence. LSA-C.C. art. 209(A); State v. Tantillo, 620 So.2d 346 (La.App. 5 Cir.1993). Simply stated, it must be shown that paternity by the defendant is more probable than not. State, Dept. of Social Services v. Thomas, 27,248 (La.App. 2 Cir. 8/23/95), 660 So.2d 163. Although alone insufficient to prove paternity, scientific testing provides persuasive and objective evidence that can help establish paternity by a preponderance of the evidence. LeBlanc v. LeBlanc, 497 So.2d 1361 (La. 1986); McKenzie v. Thomas, 95 2226 (La. App. 1 Cir. 6/28/96), 678 So.2d 42, writ denied, 96-1855 (La.10/25/96), 681 So.2d 372. Proof of paternity is a factual question, and a trial court's determination of the issue should not be disturbed, absent manifest error. Litton v. Litton, 624 So.2d 472 (La.App. 2 Cir. 1993), writ denied, 93-2657 (La.1/7/94), 631 So.2d 456.
Since defendant alleges that the trial judge relied on inaccurate testimonies and substantive facts in making her finding of paternity, we will now review in its entirety the testimony and evidence adduced at the December 11, 1995 paternity hearing. At that hearing, Ann Ruiz, a paternity worker with the Jefferson Parish District Attorney's Office, testified that she arranged the court-ordered blood work through Gentest Laboratories, and that the results of the blood test showed a 99.994% probability that defendant is the father of A.D.W.
In addition, Liz Ocker, a URESA supervisor with the Jefferson Parish District Attorney's Office, testified that plaintiff went through the Florida authorities to file her paternity affidavit in which she alleged that defendant was the father and that she had sexual relations with him. Ms. Ocker testified that plaintiff named defendant as the father in the paternity affidavit as well as in every interrogatory that she was asked to complete.
After the testimony of Ms. Ocker, defendant began the presentation of his case by calling his sister, Barbara Ryals, who testified that during August and the early part of September of 1983, she and her siblings, including defendant, took shifts staying with their sick parents at East Jefferson General Hospital. According to Ms. Ryals, plaintiff, a nursing assistant at the hospital, became very interested in their family, to the point of being abnormally friendly. Ms. Ryals further testified that during this time frame, her brother spent every night at the hospital, that he was not dating anyone to her knowledge, and that she never saw any displays of affection between her brother and plaintiff. Additionally, she testified that defendant did not have a birthmark on his leg as alleged by plaintiff.
Defendant then called Betty Planchard, his other sister, as a witness. After the parties stipulated that her testimony would be the same as that of Barbara Ryals, the court allowed her to testify about her perspective of plaintiff. She testified that during her parents' hospital stay, plaintiff frequented her parents' room to the point of being bothersome; however, she persuaded her brother not to report the nurse since they were relying on the people in the hospital for their parents' care. Ms. Blanchard also testified *1035 that defendant did not have a birthmark on his leg.
Defendant continued the presentation of his case by calling Joseph Fradella, who testified that one night in the summer of 1983, he went to East Jefferson Hospital to pick up some medicine from defendant, a veterinarian, for his sick pet. After he got the medicine from defendant in the hallway, he asked defendant for directions to the nearest bathroom. Defendant directed him to his mother's hospital room. When Mr. Fradella opened the bathroom door, he observed a "dark complected, dark head, kind of kinky frizzy hair looking nurse," lying on the bathroom floor with her feet elevated on the toilet and her pants down to her knees. Mr. Fradella immediately closed the door, walked back outside, and told defendant that there was a crazy looking nurse lying on the floor. They went back into the room, and when defendant knocked on the door, a young lady came out and said "I'll see you later Emile, I got to go back to work." While he and defendant stood in the doorway of the bathroom, they observed a red looking bulb with a glass tube on the floor by the side of the toilet. Thinking that it was part of his mother's hospital care, defendant picked it up and put it in the drawer of the table by his mother's bed. Fradella also testified that although he could not personally identify the lady in the bathroom, the small xeroxed photograph of plaintiff which defendant displayed to him during his testimony, resembled her.
As part of his case, defendant then requested that an officer or member of the court examine his legs to determine the existence of a birthmark as alleged by plaintiff. In accordance with this request, Greg Lacy, a court probation officer, testified that he accompanied defendant into a room, examined his legs, and did not observe any birthmarks or scars on his legs.
Mr. Frisard then testified that from mid-August through the early part of September, he spent every night at East Jefferson Hospital taking care of his sick parents. During that time frame, plaintiff, a nurse at the hospital, became very friendly and always wanted to do things for his family to the point of being bothersome. In fact, she would even find him in the cafeteria while he was eating and would tell him about her family problems including the fact that her husband was a drug user and was incarcerated. Even though plaintiff persisted to bother him, he did not report her behavior because he relied on the people at the hospital to take care of his sick parents. Although defendant denied ever having sexual intercourse with this woman, partly due to his fear of Aids, he admitted that one night, "this woman came upon me in the waiting room and she told me that she wanted to perform oral sex on me," and "as being any male would, I did not refuse and I wish I would have refused." Defendant testified that plaintiff had him wear a condom, but he denied having any knowledge of what she planned to do with the sperm. Several months later, plaintiff started insinuating that he might be the father of her child, and although he did not personally see her do it, he believed that she may have inseminated herself. At that point, he went to his mother's house and retrieved the object that he and Mr. Fradella found on the hospital floor and which he originally believed to be part of his mother's hospital care. Defendant claimed that he found the tube the same day that plaintiff performed oral sex on him.
In the present case, regardless of the reasons given by the trial judge, the evidence presented clearly supported her determination that defendant is the father of the minor child, A.D.W. The evidence of paternity consisted of plaintiff's affidavit in which she named defendant as the father of the child, admitted that she had sexual intercourse with him in September of 1983, and further claimed that she did not have sexual intercourse with any other man thirty days prior to or thirty days after the date of conception which was estimated to be September 1, 1983. In addition, the results of the blood testing[3] showed a 99.9994% probability of *1036 paternity as compared to an untested, unrelated, random person of the Caucasian population. Moreover, defendant's own testimony showed that he had some sort of sexual contact with plaintiff around the time frame of alleged conception, although he denied that they had sexual intercourse. In addition to the testimony and evidence presented, the trial judge also apparently reviewed the interrogatories pursuant to defendant's approval, as well as defendant's post-trial memorandum prior to making her determination of paternity.
Accordingly, based on the record before us, we find that paternity was proved by a preponderance of the evidence. Thus, the juvenile judge did not commit manifest error in determining that defendant is the father of the minor child, A.D.W.

PRE-TRIAL DISCOVERY MATTERS
In his second alleged error, defendant complains that he was deprived of his right to a fair trial due to various pre-trial rulings relating to discovery matters. Specifically, defendant claims that he did not receive relevant medical discovery due to the failure of the plaintiff to be forthcoming with the answers to the interrogatories, the failure of the assistant district attorney to make plaintiff file responsive discovery, and the failure of the trial court to enforce its own compel order. Intertwined with his argument of inadequate discovery, defendant also complains that the trial court committed manifest error when it failed to grant a continuance based on defendant's request for additional blood testing and his request to depose plaintiff, as well as plaintiff's failure to answer a second set of discovery requests.
From a review of the record as a whole, we find that defendant was allowed adequate discovery as well as ample time within which to complete the discovery. In May of 1994, defendant served on plaintiff through the district attorney's office, a set of interrogatories and a request for production of documents. Plaintiff filed her responses to defendant's discovery requests in August of 1994. Not satisfied with the information that he received, defendant, in January of 1995, filed a Motion to Compel asserting that plaintiff failed to properly answer the interrogatories, that many of her answers were non-responsive, and that she failed to provide the documents requested. At the same time, defendant also filed a Motion to Dismiss based, in part, on plaintiff's improper responses to the interrogatories and her failure to produce documents.
The court conducted a hearing on these motions on January 27, 1995. After considering the law and evidence presented, the juvenile court judge denied defendant's Motion to Dismiss but granted in part and denied in part his Motion to Compel. Regarding the Motion to Compel, the court reviewed each answer which defendant claimed was unsatisfactory, and then ordered plaintiff to amend her answers to several of the interrogatories and to include certain relevant information. After ordering plaintiff to amend some of her answers, the court found that the remaining interrogatories were either irrelevant to the case or had been sufficiently answered. Regarding the request for production of documents, the court ordered plaintiff to provide defendant with a copy of the child's birth certificate, and found that the other requests were either irrelevant or had been sufficiently provided. Defendant subsequently filed a writ application with this court seeking review of the trial judge's rulings. On April 10, 1995, this court denied defendant's writ application, stating as follows:
On the showing made we find no abuse of the trial judge's discretion in failing to *1037 order the production of documents and answers to interrogatories. The denial was based on irrelevance as well as requests having been sufficiently answered. We find no error in the trial judge's refusal to dismiss the petition for failure to answer interrogatories or production of documents as well as an exception of vagueness. The exception of vagueness was cured by an amended petition and we find no abuse in the trial judge's handling of the discovery matters. Finally, relator's argument he had a "surprise" hearing on blood testing is without merit as there is no indication from either the minute entry of the judgment that relator objected to the hearing going forward or filed a Motion for Continuance.
While awaiting a disposition from this court, defendant filed a second Motion to Dismiss alleging that he still had not received the complete answers and documents as ordered by the court in its January 27, 1995 ruling on his Motion to Compel. After a hearing on April 3, 1995, the court denied the Motion to Dismiss but set another hearing to review the issue of compelling plaintiff to answer the interrogatories in more detail. Once again, on April 21, 1995, the juvenile court considered defendant's Motion to Compel and individually reviewed the answers to the interrogatories that defendant found unsatisfactory. After reviewing the complained of answers, the trial judge found that plaintiff's responses were satisfactory, but she did order the plaintiff to submit an affidavit that the original answers to interrogatories were true and correct to the best of her knowledge. In this appeal, defendant still complains about inadequate medical discovery.
LSA-C.C.P. art. 1422 provides the scope of discovery as follows:
Unless otherwise limited by order of the court in accordance with this Chapter, the scope of discovery is as set forth in this Article and in Articles 1423 through 1425. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.
In addition, LSA-C.C.P. art. 1459 provides that interrogatories may relate to any matters which can be inquired into under Articles 1422 through 1425, and the answers may be used at trial to the extent permitted by rules of evidence. It is well established that trial courts in Louisiana have broad discretion when regulating pre-trial discovery, which discretion will not be disturbed on appeal absent a clear showing of abuse. Moak v. Illinois Central Railroad Company, 93-0783 (La.1/14/94), 631 So.2d 401. In the present case, we find that defendant was given more than adequate discovery and that plaintiff sufficiently responded to the interrogatories that were relevant, although defendant was not pleased with some of her responses.
We next consider defendant's claim that the trial judge erred in denying his Motions for Continuance which were based on allegations of incomplete discovery, and more specifically defendant's request for additional blood tests as well as an opportunity to take plaintiff's deposition.
In November of 1995, defendant corresponded with the assistant district attorney assigned to the case, informing him that his discovery was still not complete. Defendant expressed his desire to set up a telephone deposition of plaintiff as well as serving plaintiff with additional interrogatories. In accordance with the intent expressed in his letter, defendant served a set of eight interrogatories on plaintiff as well as a request for production of documents. On December 7, 1995, defendant filed a Motion for Continuance on the basis that his discovery was not complete, that he had not received answers to the newly propounded interrogatories, *1038 that he attempted and still wants to take a telephone deposition of plaintiff, and that he had judicial conflicts because of a hearing in an unrelated matter in another court at the same time as this trial. The court denied this Motion for Continuance. On December 8, 1995, defendant filed a supplemental Motion for Continuance or reconsideration of the same based again in part on incomplete discovery. Along with this Motion to Continue, defendant filed a Motion to Compel and allow further discovery and order production of previously compelled evidence. On December 11, 1995, the date set for trial, defendant again filed a Motion for Continuance, seeking time to take plaintiff's deposition and for additional blood testing. On December 11, 1995, the trial judge denied defendant's Motion for Continuance, Supplemental Motion for Continuance, and Motion to Compel and allow further discovery and order production of previously compelled evidence. The matter thereafter proceeded to trial for a determination of the paternity issue. Defendant now complains about the trial judge's denial of his Motions to Continue and claims that a continuance was mandated by LSA-art. 1602. LSA-C.C.P. art. 1601 provides that a continuance may be granted in any case if there is good ground therefor. While Article 1601 is discretionary, LSA-C.C.P. art. 1602 provides mandatory grounds for continuance and reads as follows:
A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance.
Absent peremptory causes, the decision to grant a continuance rests in the sound discretion of the trial judge. LSA-C.C.P. art. 1601. A trial judge has wide discretion in the control of his docket, in case management and in determining whether a Motion for Continuance should be granted. Willey v. Roberts, 95 1037 (La.App. 1 Cir. 12/15/95), 664 So.2d 1371, writ denied, 96-0164 (La.3/15/96), 669 So.2d 422. The trial court's ruling on a Motion for Continuance will not be disturbed on appeal absent a clear showing of abuse of that discretion. Metropolitan Reporters, Inc. v. Avery, 95-504 (La. App. 5 Cir. 11/28/95), 665 So.2d 547; Matter of Leaman, 94-119 (La.App. 5 Cir. 9/14/94), 643 So.2d 1286. No such showing was made in this case. As noted by the trial judge, defendant had ample time to conduct discovery and prepare a defense. The paternity hearing was originally set for April 11, 1995, but was continued twice to allow defendant to conduct discovery through interrogatories. Moreover, defendant learned the results of the blood test in August of 1995 and therefore had ample time to conduct further discovery, including the taking of plaintiff's deposition, if he felt that was warranted. Regarding defendant's request for a continuance based on additional blood testing, defendant failed to follow the proper procedure as set forth in LSA-R.S. 9:397.3, which provides in part that "[a] party may challenge the testing procedure within thirty days of the date of receipt or service of the notice."
Based on the foregoing discussion, we conclude that defendant was given adequate discovery as well as ample time within which to conduct the discovery. Moreover, we find that the juvenile court judge did not abuse her discretion in denying defendant's Motions for Continuance which were based on incomplete discovery.

EXCLUSION OF EVIDENCE
In his third alleged error, defendant complains about the trial judge's exclusion of two pieces of evidence. At trial, defendant attempted to offer into evidence a March 1995 newspaper article to show the frequency of self-insemination. Defendant also tried to introduce the medical device that plaintiff allegedly used to inseminate herself. When the trial judge refused to allow these two items into evidence, defendant offered them as a proffer. Defendant now contends that the trial judge erred in excluding this relevant evidence.
According to LSA-C.E. art. 402, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, *1039 this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." Relevant evidence is defined in LSA-C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In determining the relevancy of evidence, the trial judge is given wide discretion, and such determinations will not be disturbed on appeal absent a clear abuse of that discretion. Tramontin v. Glass, 95-744 (La.App. 5 Cir. 1/30/96), 668 So.2d 1252.
We will first turn our attention to the newspaper article. The article in question was written over eleven years after the date of plaintiff's alleged insemination. Moreover, the article focused on the issue of self-insemination in relation to the risk of contracting AIDS. Accordingly, we do not find that the trial judge abused her discretion in excluding this evidence as irrelevant.
Next we will consider the trial judge's exclusion of the medical device which plaintiff allegedly used to inseminate herself. The initial authentication decision as to admissibility of evidence is made by the trial judge using the standard set forth in LSA-C.E. art. 901. Paragraph A of that article provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In Evans v. Olinde, 609 So.2d 299, 304-305 (La. App. 3 Cir.1992), writ denied, 616 So.2d 697 (La.1993), reconsideration denied, 617 So.2d 923 (La.1993), a panel of the Third Circuit stated:
Cases in the jurisprudence often state it is a fundamental law of evidence that an article or substance which is introduced as demonstrative evidence, or to which a witness is asked to testify, must be sufficiently identified as the one involved in the occurrence in question. The foundation must be laid which connects the specimen with its source, showing that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested. [Citations omitted.]
The purpose of the chain of custody rule is to assure the integrity of the evidence, i.e. to prevent the evidence from being tampered with or from being lost. [Citations omitted.] At least in a civil case, the chain of custody rule does not require a twenty-four hour vigilance of the evidence. It requires that its integrity be preserved, and that it be protected from being tampered with or lost. [Citations omitted.]
Despite defendant's contention that he laid the proper foundation for this evidence, we find that the trial judge did not abuse her discretion in excluding the medical device allegedly used by plaintiff to inseminate herself. There was no evidence presented which connected plaintiff to the object in question as defendant readily admitted that he did not see plaintiff use it. In fact, he testified that when he found it on the bathroom floor, he assumed that it was part of his mother's hospital care and he placed it with her belongings. In addition, approximately twelve years had elapsed between the time that the object was found on the hospital floor and the attempted introduction of it into evidence at the paternity hearing. Despite defendant's claim that the item has been retained, the circumstances surrounding the handling and preserving of this piece of evidence during this lengthy time frame is not known.
Moreover, even though the trial judge did not allow the object to actually be introduced into evidence, she did allow and consider testimony by Joseph Fradella and defendant surrounding the discovery of the object. Additionally, during Mr. Fradella's testimony, he identified the device displayed by defendant, a red looking bulb with a glass tube, as the object that he saw lying on the floor of the hospital bathroom by the side of the toilet.
Thus, we find no error in the trial judge's exclusion into evidence of either the newspaper article or the medical device which plaintiff allegedly used to inseminate herself.

DETERMINATION OF CHILD SUPPORT
In his final assignment, defendant complains about the amount of child support that *1040 he was ordered to pay. Specifically, he complains because the amount was based on his past average income rather than his current earnings. He also complains because the trial court did not have before it the financial records of plaintiff.
At the February 26, 1996 hearing to determine the appropriate amount of child support, Ann Ruiz of the Jefferson Parish District Attorney's Office, testified that a proposed support amount was reached by using a multi-family formula, giving defendant credit for costs of the child living in his home as well as for costs of medical insurance for the child at issue, A.D.W. She further testified that in reaching that amount, she averaged defendant's income from 1991 through 1995. After her calculations, she recommended that defendant be ordered to pay support in the amount of $436.81 per month retroactive to the date of the filing of the petition, resulting in arrears of $17,909.21. Ms. Ruiz then suggested that defendant pay $100.00 per month toward arrears and $25.00 per month toward the cost of the blood work in his paternity case. Additionally, she suggested that defendant be assessed 5% court costs.
Defendant testified in his own behalf at the support hearing and disagreed with the amount of support recommended by Ann Ruiz. Defendant indicated to the court that his income had decreased since 1993 and provided the court explanations for that decrease, including a problem with an advertisement that he placed in the Yellow Pages, the opening of a veterinary clinic in close proximity to his business, the medical problems of his elderly parents, his development of a nervous problem requiring medication, and the damage caused to his business premises as a result of flooding. He testified that under his present circumstances, he could afford to pay $100.00 per month, and additionally would pay the child's health insurance premiums. After considering the testimony and looking at the worksheets used to arrive at the suggested support amount, the trial judge accepted Ms. Ruiz's recommendations as to the amount of child support due by defendant.
The Uniform Interstate Family Support Act, in LSA-Ch.C. art. 1303.3, provides as follows:
Except as otherwise provided by this Chapter, a responding court of this state shall:
(1) Apply the procedural and substantive law, including the rules on choice of law, generally applicable to similar proceedings originating in this state and shall exercise all powers and provide all remedies available in those proceedings.
(2) Determine the duty of support and the amounts payable in accordance with the law and support guidelines of this state.
Under this provision, courts are directed to follow Louisiana law to determine the appropriate amount of child support. Thus, we turn to the Child Support Guidelines set forth in LSA-R.S. 9:315 to 9:315.15. These guidelines are to be used in any proceeding to establish or modify child support filed on or after October 1, 1989. There is a rebuttable presumption that the amount of child support obtained by use of the guidelines is the proper amount of support. LSA-R.S. 9:315.1 A; State v. Lagman, 95-412 (La.App. 5 Cir. 2/14/96), 670 So.2d 1278.
In order for the trial judge to determine the basic child support obligation, LSA-R.S. 9:315.2 provides:
A. Each party shall provide to the court a verified income statement showing gross income and adjusted gross income, together with documentation of current and past earnings. Suitable documentation of current earnings shall include but not be limited to pay stubs, employer statements, or receipts and expenses if self-employed. The documentation shall include a copy of the party's most recent federal tax return. A copy of the statement and documentation shall be provided to the other party.
B. If a party is voluntarily unemployed or underemployed, his or her gross income shall be determined as set forth in R.S. 9:315.9.
C. The parties shall combine the amounts of their adjusted gross incomes. Each party shall then determine by percentage his or her proportionate share of the combined amount. The amount obtained for *1041 each party is his or her percentage share of the combined adjusted gross income.
D. The court shall determine the basic child support obligation amount from the schedule in R.S. 9:315.14 by using the combined adjusted gross income of the parties and the number of children involved in the proceeding.
E. After the basic child support obligation has been established, the total child support obligation shall be determined as hereinafter provided in this Part.
In the present case, the trial judge stated that she set the amount of support in accordance with the guidelines, and found no reason to deviate therefrom even though defendant claimed that his income had decreased since 1993. While the proper documentation may have been provided to the trial court and to the individual who determined the amount of support, there is nothing contained in the appellate record which enables us to determine the propriety of the amount of child support. The only documentation contained in this record is the worksheet used by Ms. Ruiz in calculating the amount of child support. In addition, defendant introduced some unverified documentation which he compiled himself in an attempt to show a decrease in his income over the last several years. Accordingly, due to lack of proper documentation and evidence herein, we vacate the child support judgment and remand the matter for recalculation of the support obligation in accordance with the provisions of LSA-R.S. 9:315 et seq. See Inzinna v. Acosta, 623 So.2d 1357 (La.App. 5 Cir.1993) and Mannina v. Mannina, 588 So.2d 176 (La.App. 5 Cir.1991). In all other respects, the judgment is affirmed.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] Effective January 1, 1996, URESA was repealed and replaced with the Uniform Interstate Family Support Act (UIFSA).
[2] Pursuant to the court's finding that plaintiff's paternity affidavit was too vague on the date of conception, plaintiff amended her affidavit to allege September 1, 1983 as the specific conception date.
[3] LSA-R.S. 9:397.3 B reads as follows:

B. (1) If the court finds there has been a procedural error in the administration of the tests, the court shall order an additional test made by the same laboratory or expert.
(2)(a) If there is no timely challenge to the testing procedure or if the court finds there has been no procedural error in the testing procedure, the certified report shall be admitted in evidence at trial as prima facie proof of its contents, provided that the party against whom the report is sought to be used may summon and examine those making the original of the report as witnesses under cross-examination.
(b) A certified report of blood or tissue sampling which indicates by a ninety-nine and nine-tenths percentage point threshold probability that the alleged father is the father of the child creates a rebuttable presumption of paternity.